IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHRISTOPHER WYMA,

     Plaintiff,

v.                               Case No. 3:18-CV-962-NJR

MOHAMMED SIDDIQUI, M.D.,

     Defendant.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In the fall of 2017, Plaintiff Christopher Wyma ("Wyma") began experiencing severe digestive issues. He had been diagnosed with irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD") as a child, but now he was vomiting after every meal and rapidly losing weight. In the spring of 2017, he weighed 166 pounds; by the spring of 2018 he weighed only 115 pounds. By July 2018, Wyma was down to 108 pounds. Wyma sought medical care and urged his doctor to refer him to a specialist for an endoscope, but as a prisoner in the Illinois Department of Corrections (IDOC), he was subject to procedures set by the IDOC and its contracted medical care provider, Wexford Health Sources, Inc.

Eventually, Wyma was diagnosed with severe achalasia and had surgery in November 2018—more than a year after he first experienced symptoms. Wyma believes one of Wexford's doctors, Mohammed Siddiqui, was deliberately indifferent to his medical needs in violation of the Eighth Amendment by not referring him to a specialist

sooner and causing a delay in his medical treatment.

Wyma filed this lawsuit against Dr. Siddiqui on April 17, 2018 (Doc. 1),[1] and Dr. Siddiqui has moved for summary judgment. (Doc. 130). Wyma responded through appointed counsel (Doc. 134), and Dr. Siddiqui filed a reply brief (Doc. 137).[2] For the reasons set forth below, Dr. Siddiqui's motion for summary judgment is denied.

## BACKGROUND

Wyma entered Menard Correctional Center in April 2017. (Doc. 131-2 at p. 1). According to his Offender Health Status Transfer Summary, Wyma reported having a history of acid reflux, hypertension, and IBS. (*Id.*). He had prescriptions for Pepcid, a medication used to decrease acid production in the stomach, and Bentyl, a medication used to relieve cramps or spasms of the stomach, intestines, and bladder. (Doc. 131-1 at p. 2). His prescriptions for these medications were continued at Menard. (*Id.* at pp. 2-3). When he saw a nurse for a medication refill on May 10, 2017, his weight was 166 pounds. (Doc. 131-2 at p. 4).

In September 2017, Nurse Practitioner Michael Moldenhauer saw Wyma for his report of an achy stomach and a request for Pepcid and Bentyl. (Doc. 131-1 at p. 3). Wyma told Moldenhauer that he had IBS since he was 10 years old. (*Id.*; Doc. 131-2 at p. 8). Wyma returned to Moldenhauer on October 15, 2017, complaining that he was vomiting every

---

[1] Wyma filed a parallel lawsuit on January 16, 2018, alleging Dr. Siddiqui was deliberately indifferent for failing to provide him with necessary medication for acid reflux, irritable bowel syndrome, and a psychiatric condition. This lawsuit addresses only Dr. Siddiqui's delay in referring Wyma to a specialist for a scope of his esophagus. *See Wyma v. Siddiqui, et al.*, Case No. 18-CV-92.

[2] Wyma has moved to strike Dr. Siddiqui's reply brief because, he argues, it does not identify any exceptional circumstances for filing the reply, as required by Local Rule 7.1. The Court disagrees, as the reply brief directly addresses new facts and arguments presented by Wyma for the first time in his response brief. Thus, Wyma's Motion to Strike (Doc. 138) is **DENIED**.

time he ate. (Doc. 131-2 at p. 10). Wyma thought it was because he did not have enough time to eat, so Moldenhauer gave Wyma a permit to eat in his cell. (*Id.*). By this point, Wyma's weight had dropped to 145 pounds. (*Id.*). Moldenhauer prescribed antibiotics for a possible Helicobacter pylori infection and planned to refer Wyma to the doctor for his persistent vomiting. (*Id.*).

Wyma saw Moldenhauer again on November 29, 2017. (*Id.* at p. 14). Moldenhauer noted Wyma's long history of gastritis, that he was pale, and that Wyma reported spitting up saliva and vomiting every day for the past five months. (*Id.*). Moldenhauer's assessment was possible nervousness, anxiety, chronic gastritis, or diverticulitis. (*Id.*). Moldenhauer ordered a kidney, ureter, and bladder x-ray, a chest x-ray, a comprehensive metabolic panel, a complete blood count with C. diff., a urinalysis, and a fecal occult blood test, and he referred Wyma to Dr. Siddiqui for further evaluation in one to two weeks. (*Id.*).

After Wyma's visit with Moldenhauer in November 2017, his symptoms worsened. (Doc. 131-5 at p. 31-32). He testified that more food was coming up, he had more pain after swallowing, he had the chills, and he had become very weak and pale. (*Id.* at p. 32). While vomiting, Wyma would have extremely strong headaches. (*Id.*). He began sleeping 12 or more hours a day, and he rarely had bowel movements. (*Id.*). The x-rays and lab tests ordered by Moldenhauer were completed in early December 2017 and all came back normal. (Doc. 131-2 at pp. 15-16). On December 6, 2017, Wyma weighed 140 pounds. (*Id.* at p. 15).

Dr. Siddiqui examined Wyma on December 21, 2017. (*Id.* at p. 16). Wyma self-

reported having IBS since childhood and an esophagogastroduodenoscopy ("EGD") at age 15. (*Id.*). An EGD is a diagnostic procedure in which an endoscope is used to examine the lining of the esophagus, stomach, and first part of the small intestine.[3] Dr. Siddiqui discontinued Wyma's prescription for Pepcid and instead prescribed Prilosec, which is a stronger acid control medicine. (*Id.*; Doc. 131-4 at p. 34). He also added a prescription for Reglan, which is used to treat the symptoms of slow stomach emptying by increasing the contractions of the stomach and intestines. (*Id.*; Doc. 131-1 at p. 4).

At his appointment on December 21, 2017, Wyma asked Dr. Siddiqui to refer him to an outside specialist to perform an EGD. (*Id.* at 34). Wyma told Dr. Siddiqui that it felt like food was getting stuck at the bottom of his throat and that he needed a scope to see if his sphincter muscle was malfunctioning. (*Id.*). Wyma testified that Dr. Siddiqui told him he was exaggerating his symptoms and looking for attention by refusing to eat, that he just had severe acid reflux, and that his x-rays came back fine so he couldn't see what was possibly wrong. (*Id.*). Wyma also testified that Dr. Siddiqui told him he would not put in for an EGD because Wexford would deny it anyway, because "Menard and Wexford don't pay for that type of stuff." (*Id.* at p. 35.)

Conversely, Dr. Siddiqui testified that in December 2017 he did not order additional tests or try to determine if Wyma had problems other than acid reflux or GERD because, in his "professional judgment, [Wyma's] already been seeing doctors. He's already been getting medications. He already know[s] his diagnosis. So there was no

---

[3] "EGD – esophagogastroduodenoscopy," MedlinePlus, https://medlineplus.gov/ency/article/003888.htm (last visited May 26, 2023).

reason for me to suspect anything, so I continued his treatment at this point." (Doc. 131-4 at p. 37). Dr. Siddiqui admitted he had no record of any EGD that was done in the past and that he knew Wyma had GERD only because "everybody had been treating him for GERD" and "he has been on those medications." (*Id.* at pp. 38, 39). Dr. Siddiqui also does not remember telling Wyma he most likely would not be approved for an EGD in December 2017. (*Id.* at p. 40).

By January 2018, Wyma was vomiting more of his food each time he ate. (Doc. 131-5 at p. 38). At sick call in late January 2018, Wyma told a nurse that he could not keep food down or eat anything solid. (Doc. 131-2 at p. 17). His weight was down to 135 pounds. (*Id.*). Wyma was instructed to chew his food thoroughly, take small bites, and sit upright when eating. (*Id.*). The nurse also ordered an x-ray of Wyma's neck and additional lab tests. (*Id.*).

On February 8, 2018, Dr. N. Yousuf, an outside radiologist, took an x-ray of Wyma's neck. (Doc. 134-1 at p. 55). Dr. N. Yousuf reviewed the report and found no problems. (*Id.*). For further assessment of Wyma's difficulty swallowing, Dr. Yousuf suggested an air contrast esophogram. (*Id.*). Dr. Siddiqui testified that he did not pursue an esophogram because "it was not necessary to do. . . . Because [Wyma] was—he would have been seen by [a] gastroenterologist and there are better tests than this, which is endoscopy, direct vision through a scope." (Doc. 131-4 at p. 50).

Dr. Siddiqui saw Wyma for the second time on March 7, 2018. (Doc. 131-2 at p. 21). Dr. Siddiqui noted Wyma's history of IBS and GERD, his inability to keep food down, and the fact that he now weighed 121 pounds—a loss of 15 pounds in one month and

40 pounds in one year. (*Id.*). He further noted that Wyma's bloodwork was negative and advised Wyma to drink Boost. His note concluded: "Refer collegial for EGD?" (*Id.*). Dr. Siddiqui testified that he wanted an EGD for Wyma, and the question mark was in reference to whether a gastroenterologist would like to do an EGD or not. (Doc. 131-4 at p. 51). That same day, Dr. Siddiqui filled out a Medical Special Services Referral and Report to refer Wyma to a gastroenterologist. (Doc. 131-2 at p. 53).

Dr. Siddiqui's request to refer Wyma to an outside gastroenterologist had to be approved through Wexford's collegial review process. Collegial review occurred on a weekly basis. (Doc. 131-4 at p. 94). Dr. Siddiqui's collegial referral for a GI specialist stated only that Wyma had a history of IBS and GERD, that he had lost 40 pounds in a year, and that he was unable to retain food and liquid. (Doc. 131-2 at p. 53).

On March 16, 2018, Dr. Ritz, Wexford's Utilization Management Physician, denied the request for a GI evaluation. (Doc. 131-3 at p. 1). Dr. Ritz stated, "ATP [alternate medical plan] needed for more information. Need labs including TSH [thyroid stimulating hormone] and ESR [erythrocyte sedimentation rate], his commissary list, and MAR [medication administration record]." (*Id.*).

Wyma filed this lawsuit on April 17, 2018, and, on May 4, 2018, the Court construed the complaint as containing a request for preliminary injunctive relief. (Docs. 7, 8).

Dr. Siddiqui appealed the denial of the GI referral on April 19, 2018, and provided the requested information. (Doc. 131-3 at p. 3). Dr. Ritz reviewed Wyma's labs, x-rays, MAR, and commissary list. (*Id.*). Dr. Ritz made an ATP to discuss Wyma's case with Dr.

Siddiqui at the next collegial. (*Id.*). After Wyma's case was reviewed between Dr. Ritz and

Dr. Siddiqui in collegial, Dr. Ritz approved the GI evaluation on May 4, 2018—the same

day and several hours after the Court set a hearing on Wyma's motion for preliminary

injunction. (*Id.* at p. 6; Doc. 10). At the preliminary injunction hearing held on May 8,

2018,[4] Wyma testified as to his medical condition, weight loss, pain, and other symptoms.

(Doc. 134-1 at pp. 74-75). Wyma further testified that Dr. Siddiqui said he was just

refusing to eat. (*Id.*). Dr. Siddiqui also appeared and informed the Court that Wyma had

been approved to see a GI specialist and that an appointment would be scheduled within

two weeks. (Doc. 15).

On May 16, 2018, Wyma saw Dr. Mark Feldman, a gastroenterologist. (Doc. 131-3

at p. 9). Dr. Feldman recommended an EGD. (*Id.*). Dr. Ritz approved the EGD on May 24,

2018, but the procedure did not occur for nearly two more months. (*Id.* at pp. 10, 16). On

July 17, 2018, Dr. Feldman performed the EGD and diagnosed Wyma with severe

achalasia, a rare disorder that makes it difficult for food and liquid to pass from the

esophagus into the stomach. (*Id.*). He also recommended that an esophageal motility

---

[4] This hearing was held by Magistrate Judge Donald G. Wilkerson (*see* Docs. 14, 15), who has since retired.
Magistrate Judge Wilkerson issued a Report and Recommendation on the motion on December 13, 2018,
recommending that Wyma's motions for preliminary injunctive relief be denied, because "[a]t this
juncture. . . it is apparent that Plaintiff has received significant care, that he is currently under the care of a
specialist, that he has undergone surgery, and that he is recovering from that surgery. As such, there is no
showing of irreparable harm absent an injunction. In any event, counsel has been recruited for Plaintiff
who will be in a position to determine whether additional injunctive relief may be necessary in light of the
care that Plaintiff has received to date." (Doc. 31). The Report and Recommendation was later rejected by
the undersigned, because appointed counsel had entered in the case, and the Court gave counsel additional
time, up to and including May 10, 2019, to file an amended motion for preliminary injunction and/or a
motion for leave to file an amended complaint. (Doc. 46). That deadline was later extended to July 9, 2019,
at the request of appointed counsel. (Doc. 49). After receiving an additional extension of time, counsel filed
a First Amended Complaint on January 17, 2020. (Doc. 64). The motions for preliminary injunction were
never refiled.

study be performed. (*Id.*).

In August 2018, Dr. George Patterson, a cardiothoracic surgeon, performed an esophageal motility study and confirmed the diagnosis of achalasia Type 2. (Doc. 131-3 at p. 47). In November 2018, Dr. Patterson performed a laparoscopic Heller myotomy on Wyma. (Doc. 131-1 at p. 5).

Since having the surgery, Wyma testified he has had three or four additional scopes and procedures involving a balloon stretching his diaphragm. (*Id.* at p. 68). He still regurgitates food, but is able to keep most of it down. (*Id.*). He also has a stabbing pain in his throat and esophagus. (*Id.* at p. 71, 110). Wyma testified that he anticipated returning every few years for his throat to be stretched, but he has already had to go back several times—and he may have to continue to do so for the rest of his life. (*Id.* at p. 72). Wyma attributes his recurring pain and symptoms of achalasia to the fact that he wasn't treated sooner. (*Id.* at 69-71).

## LEGAL STANDARD

Summary judgment is proper if the movant shows that no material facts are in genuine dispute and that he is entitled to judgment as a matter of law. *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (citing FED. R. CIV. P. 56(a)). "A genuine dispute over a material fact exists if 'the evidence is such that a reasonable jury could return a verdict' for the nonmovant." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).

DISCUSSION

**A.**     **Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment prohibits "cruel and unusual punishment" and imposes a duty on prison officials to take reasonable measures to ensure that inmates receive adequate medical care. *White v. Woods*, 48 F.4th 853, 861 (7th Cir. 2022). "Because depriving a prisoner of medical care serves no valid penological purpose, 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.'" *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

To succeed on claim of deliberate indifference, a plaintiff must show that "(1) he had an objectively serious medical need (2) to which [the defendants] were deliberately indifferent." *Id.* (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021)). Here, there is no dispute that Wyma had an objectively serious medical need. Thus, the only question is whether Dr. Siddiqui was deliberately indifferent to that need.

A prison official acts with deliberate indifference when he has actual knowledge of a substantial risk of harm and then disregards that risk to the prisoner. *Dean*, 18 F.4th at 241 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). A plaintiff need not show the official intended harm or believed that harm would occur, but at the same time,

medical negligence is not enough. *Brown*, 38 F.4th at 550; *Petties*, 836 F.3d at 728). A court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

Most deliberate indifference claims rely on circumstantial evidence. *Id.* Circumstances that permit a jury to find deliberate indifference include complete denial of medical care, delay of care, a continued course of ineffective treatment, a substantial departure from accepted professional practice, ignoring an obvious risk, and refusing to provide care because of cost. *Id.* (collecting cases).

**B.**     **Wyma Exhausted His Claim of Deliberate Indifference Prior to March 7, 2018**

Before discussing the merits of Dr. Siddiqui's motion for summary judgment, the Court must clarify the period of time at issue in this case. Dr. Siddiqui posits that this case is only about his alleged failure to order an EGD when he saw Wyma on March 7, 2018. In the Court's Order of March 31, 2021, Dr. Siddiqui argues, the Court found Wyma only exhausted his administrative remedies with regard to the events of March 7, 2018. Wyma disagrees with this interpretation of the Order and argues that Dr. Siddiqui's potential liability extends to his failure to act prior to March 7, 2018.

In the Court's Order of March 31, 2021, Magistrate Judge Gilbert C. Sison[5] noted that Wyma filed an emergency grievance on February 27, 2018, regarding Dr. Siddiqui's failure to treat him. (Doc. 113). In his grievance, Wyma complained that his symptoms were worsening, he was unable to swallow, he had lost about 50 pounds, and doctors

---

[5] The case was reassigned to Judge Sison on January 8, 2019, following Judge Wilkerson's retirement. (Doc. 33).

were not running enough tests to diagnose the underlying cause of his symptoms. (*Id.*). In briefing the issue of exhaustion of administrative remedies, Defendants asserted that Wyma was trying to use the February 27, 2018 grievance to exhaust his claim regarding Dr. Siddiqui's actions on March 7, 2018. This created a "temporal problem," they argued, since the grievance was filed before the act complained of. The Court disagreed, finding that the continuing violation doctrine allowed for exhaustion of Wyma's claim that Dr. Siddiqui's decision to decline a diagnostic scope on March 7, 2018, constituted deliberate indifference.

Dr. Siddiqui takes this part of the Order out of context, arguing that his decision to decline a scope on March 7, 2018, is the *only* issue that has been exhausted and is relevant in this case. That view is too limited. In his Order, Judge Sison noted that Wyma saw Dr. Siddiqui in December 2017 and filed an emergency grievance in February 2018 complaining that "the doctors" were not running enough tests to diagnose the underlying cause of his symptoms. Defendants argued that Wyma's grievance was too vague, but the Court disagreed. Judge Sison found that "[a]lthough Plaintiff saw multiple doctors during the time period which covered his February 27th grievance, only Defendant Siddiqui could provide Plaintiff with the gastro-intestinal care Plaintiff requested. Plaintiff's grievance therefore describes both his complaints and their relation to Defendant Siddiqui sufficiently to provide the IDOC with the notice necessary to investigate his claim." (Doc. 113 at pp. 8-9). It is only after making this finding that Judge Sison moved to Defendants' argument about Wyma's "temporal problem."

In his Amended Complaint, Wyma alleges that from October 2017 until March 15,

2018, Dr. Siddiqui was deliberately indifferent to his serious medical needs. (Doc. 64). And Judge Sison found that Wyma exhausted his claims against Dr. Siddiqui "during the time period which covered his February 27th grievance." Thus, the undersigned finds that Dr. Siddiqui's actions from December 21, 2017, to March 7, 2018, are properly at issue in this matter.

**C.    A Dispute of Material Fact Precludes Summary Judgment for Dr. Siddiqui**

Dr. Siddiqui argues that the undisputed material facts show he was not deliberately indifferent to Wyma's medical needs. Dr. Siddiqui asserts that while Wyma's conditions had become less responsive to his medications in late 2017, there was no reason to doubt Wyma's prior diagnoses. Thus, rather than refer Wyma to a specialist for more invasive testing, he first changed Wyma's medication and prescribed an anti-vomiting agent. Then, when Wyma returned to him on March 7, 2018, he told Wyma to begin drinking Boost and submitted a referral to a gastroenterologist to collegial review. Dr. Siddiqui argues that an inmate is not entitled to demand specific care, and he is entitled to deference in his treatment decisions. Furthermore, he argues, there is no evidence that his actions caused any delay in Wyma's care.

It is true that an inmate cannot demand specific care. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (the Eighth Amendment does not give inmates the right to demand specific medical treatment). At the same time, however, a doctor's choice to resort to an "easier and less efficacious treatment" without exercising professional judgment can constitute deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Likewise, a physician's decision whether to refer a

prisoner to a specialist must involve the exercise of medical discretion; the refusal to do so may support a claim of deliberate indifference if the choice is "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (citing *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011)). "[I]f the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Id.* at 412.

"Although administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011); *see also Barrow v. Wexford Health Sources, Inc.*, 816 F. App'x 1, 5 (7th Cir. 2020) (the Constitution is violated when harm occurs because cost and administrative convenience is considered to the exclusion of reasonable medical judgment).

In this case, there is a dispute of material fact as to whether Dr. Siddiqui exercised his medical judgment or prioritized cost and administrative convenience when deciding not to seek a referral to a gastroenterologist between December 21, 2017, and March 7, 2018. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("Where the parties present two vastly different stories—as they do here—it is almost certain that there are genuine issues of material fact in dispute.").

As documented in his medical records, Wyma had reported vomiting every time he ate, constant abdominal discomfort, and steady weight loss for months before he saw

Dr. Siddiqui in December 2017. At his December appointment, Wyma also told Dr. Siddiqui it felt like food was getting stuck at the bottom of his throat. (Doc. 131-5 at p. 34). Despite these alarming symptoms, Wyma testified that Dr. Siddiqui told him he was exaggerating his symptoms and looking for attention by refusing to eat. Dr. Siddiqui also told Wyma he just had severe acid reflux, that his chest x-ray came back fine, and that he would not request an EGD because Wexford would not pay for it. Instead, he relied on Wyma's self-reported history of IBS and GERD (though disbelieving Wyma's self-reported vomiting and constant abdominal discomfort) and changed Wyma's prescription from Pepcid to Prilosec and Reglan.

After that appointment, Wyma's condition continued to worsen. He lost considerably more weight and continued to vomit most of his food. On February 8, 2018, Dr. Siddiqui received Wyma's blood test results and radiology report, all of which were normal and failed to explain Wyma's condition, but Dr. Siddiqui still refused to order an EGD. The radiologist recommended an esophogram, but Dr. Siddiqui testified he did not pursue that test because Wyma "would have been seen by a gastroenterologist" and that an endoscopy is a better test than an esophogram—perhaps a post hoc rationalization considering he had still refused to refer Wyma to an outside gastroenterologist at that point in time.

Construing these facts in the light most favorable to Wyma, the nonmovant, a reasonable jury could find that Dr. Siddiqui knew Wyma faced a substantial risk of harm from being unable to keep food down for months and obviously needed to see a specialist prior to March 7, 2018. By the time Dr. Siddiqui saw Wyma in December 2017, Wyma's

medical records clearly indicated he had been vomiting every time he ate for more than two months. By refusing to request a referral to a gastroenterologist until March 7, 2018, a jury could find that Dr. Siddiqui disregarded that risk of harm. A jury also could find that Dr. Siddiqui's inaction delayed Wyma's diagnosis of severe achalasia by three more months, unnecessarily causing Wyma significant additional pain, discomfort, and weight loss, in addition to a lifetime of recurring pain and treatments.

A reasonable jury also could find that Dr. Siddiqui was deliberately indifferent when he eschewed the exercise of reasonable medical judgment in favor an easier and cheaper treatment. While Dr. Siddiqui claims he had no reason to suspect that Wyma had anything other than acid reflux or GERD and, thus, just prescribed him a stronger medication, a jury is entitled to weigh a doctor's claimed ignorance of the risks stemming from his treatment decisions against context clues that the doctor did know. *Petties*, 836 F.3d at 731. "[A] doctor's claim he did not know any better [is insufficient] to immunize him from liability in every circumstance . . . where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." *Id.* Furthermore, Wyma testified that Dr. Siddiqui said he would not refer Wyma for an EGD because Wexford would not pay it. A jury crediting this testimony could find that Dr. Siddiqui did not use his medical judgment when deciding not to refer Wyma to a gastroenterologist for an EGD but rather had Wexford's bottom line in mind.

On the other hand, Dr. Siddiqui testified that he used his medical judgment when deciding not to pursue additional testing in December 2017. Dr. Siddiqui testified that, in

his professional opinion, Wyma had already been diagnosed with acid reflux and GERD, and Dr. Siddiqui had no reason to suspect that another medical issue was causing Wyma's symptoms. Therefore, with the exception of changing his prescriptions, Dr. Siddiqui continued Wyma's treatment. Dr. Siddiqui testified that his practice had nothing to do with cost and that he "would do the right thing." (Doc. 131-4 at p. 92). A jury crediting Dr. Siddiqui's version of the facts could find that he used reasonable medical judgment and was not deliberately indifferent to Wyma's serious medical needs when he did not seek a referral to a gastroenterologist until March 7, 2018.

Because there are material facts in dispute, the Court finds that Dr. Siddiqui is not entitled to judgment as a matter of law.

## CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Dr. Mohammed Siddiqui (Doc. 130) is **DENIED**.

A telephonic status conference shall be set by separate order to set this case for trial.

**IT IS SO ORDERED.**

**DATED:   June 2, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**